1  MICHEAL GOLDBERG, SBN 53614
   ADAM RUSHING, SBN 292833
2  GOLDBERG & IBARRA
   925 N Street, Suite 130
3  Fresno, CA  95321
   Telephone:  (559) 264-4878
4  Facsimile:   (559) 486-4878

5  ANDREW JONES, ESQ.
6  Law Offices of Wagner, Jones, Kopfman & Artenian
   1111 E. Herndon Ave, Suite 317
7  Fresno, CA 93720
   Telephone: (559) 449-1800
8  Facsimile: (559) 449-0749

9

10 Attorneys for Plaintiffs,
   ANTHONY KEITH TOSCANO, JULIAN MATTHEW
   TOSCANO, ANGEL INFINITY TOSCANO, and
11 JIMMY LEE LONG, individually and as Successors-
   In-interest to Angel Keith Toscano, deceased, by their
12 Mother and Guardian Ad Litem, SYLVIA MORENO

13

14

15            UNITED STATES DISTRICT COURT

16           EASTERN DISTRICT OF CALIFORNIA

17                  FRESNO DIVISION

18 ANGEL KEITH TOSCANO, JR.,          )   CASE NO. 1:13-cv-01987-LJO-SKO
   Individually and as successor-in-interest )
19 to Angel Keith Toscano, deceased;  )   (CONSOLIDATED WITH CASE NO.
   STEVEN WADE TOSCANO,               )   CV F 14-0186 LJO SKO)
20 Individually and as successor-in-interest )
   to Angel Keith Toscano, deceased, by their )
21 mother and Guardian Ad Litem,       )
   KIMBERLY HENSON; KIMBERLY          )
22 HENSON as successor-in-interest to heir )   **DECLARATION OF ADAM**
   COLE TOSCANO, now deceased;        )   **RUSHING IN OPPOSITION**
23 ANTHONY KEITH TOSCANO, JULIAN      )   **TO DEFENDANTS' MOTION**
   MATTHEW TOSCANO, ANGEL            )   **FOR SUMMARY JUDGMENT**
24 INFINITY TOSCANO, and JIMMY LEE    )
   LONG, minors, by and through their  )
25 Guardian Ad Litem, SYLVIA MORENO,  )
                                       )
26         Plaintiffs,                 )
                                       )
27 vs.                                 )
                                       )
28 CITY OF FRESNO, a municipal         )
   JERRY DYER, individually and in his )

                    DECLARATION OF ADAM RUSHING - 1

Capacity as Chief of Police for the City of    )
Frenso, OFFICER JAMES LYON;    )
OFFICER KENNETH WEBB; and DOES    )
1 through 50, inclusive,    )
                           )
            Defendants.    )
                           )
_____)

I, Adam Rushing, hereby declare and state as follows:

I am a member of counsel of record for one group of plaintiffs in the above captioned matter.

Attached hereto as Exhibit A are true and correct copies of excerpts from the deposition of Officer Brandon Lyon dated April 9, 2015, consisting of pages 16, 24-27, 30-38, 41, 44, 49-50, 55, and 59.

Attached hereto as Exhibit B are true and correct copies of excerpts from the deposition of Martha Galvan dated April 10, 2015, consisting of pages 23 and 25.

Attached hereto as Exhibit C are true and correct copies of excerpts from the deposition of Detective Brian Hance dated April 9, 2015, consisting of pages 28-31 and 54-66.

Attached hereto as Exhibit D are true and correct copies of excerpts from the deposition of Omri Orozzo dated April 10, 2015, consisting of pages 15, 17 and 18.

Attached hereto as Exhibit E are true and correct copies of excerpts from the deposition of Joseph Gomez dated June 1, 2015, consisting of pages 45-48.

I declare, under penalty of perjury, that the foregoing is true and correct of my own personal knowledge and that this declaration was executed this 7th day of July, 2015, at Fresno, California.

DATE: July 7, 2015                    Respectfully Submitted,

1

ADAM RUSHING
Attorney for Plaintiffs

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3                FRESNO DIVISION

4                    -oOo-

5   ANGEL KEITH TOSCANO, JR.,          )  CASE NO.
    individually and as               )  1:13-cv-01987-LJO-
6   successor-in-interest to          )  SKO
    Angel Keith Toscano,              )
7   deceased; et al.,                 )  (CONSOLIDATED WITH
                                      )  CASE NO. CV F
8                  Plaintiffs,        )  14-0186 LJO SKO)
                                      )
9        vs.                          )
                                      )
10  CITY OF FRESNO, a municipal       )
    corporation; et al.,              )
11                                    )
                Defendants.           )
12

13                    -oOo-

14

15    DEPOSITION OF OFFICER BRANDON LYON

16             FRESNO, CALIFORNIA

17              APRIL 9, 2015

18                    -oOo-

19

20

21          CHRISTIANSEN & HOWELL
         CERTIFIED SHORTHAND REPORTERS
22              927 NORTH FULTON
          FRESNO, CALIFORNIA 93728-3411

23               (559) 268-0266

24  Reported by:                    CERTIFIED
    RONALD C. LAING
25  C.S.R. #5171                    COPY

            CHRISTIANSEN & HOWELL                    1

1      Q.   So they were unknown to you at that day and
2   really unknown to you to this day?
3      A.   That's correct.
4      Q.   Did you witness Mr. Toscano commit any Vehicle
5   Code violations?
6      A.   Yes, sir.
7      Q.   Which ones?
8      A.   Riding his bicycle on the wrong side of the
9   street and running a stop sign, not stopping for a stop
10  sign.
11     Q.   Did Mr. Bertone also commit the same
12  infractions?
13     A.   Yes, sir.
14     Q.   Did they seem to be together?
15     A.   Yes, sir.
16     Q.   At one point, I understand that you and Officer
17  Webb approached these two gentlemen.  What's the first
18  thing you did?
19     A.   The first thing I did was activate my lights to
20  stop Mr. Bertone and Mr. Toscano.
21     Q.   Did you do anything else such as get on a blow
22  horn?
23     A.   No, sir.
24     Q.   When you activated your lights, did you
25  activate your siren?

CHRISTIANSEN & HOWELL                    16

1    entered is what I'm saying.

2          THE WITNESS:   It was the west end of the alley

3    just east of Del Mar.

4    BY MR. ROZIER:

5          Q.   Right.   So if the alley is viewed as going from

6    Glenn to Del Mar, he had gotten near -- well, say

7    90 percent through the alley?   Or do you have an opinion?

8          A.   Ninety percent is accurate.

9          Q.   Okay.   Other than driving your car as you're

10   going down the alley, were there any other warnings to

11   Mr. Toscano, like any further verbal warnings, for

12   example?

13         A.   No, sir.

14         Q.   Did you have available to you a speaker system?

15         A.   I did, yes.

16         Q.   Were your lights, your emergency lights, on as

17   you went down the alley?

18         A.   No, sir.

19         Q.   Was your siren on as you went down the alley?

20         A.   No, sir.

21         Q.   Did you maintain the 15 mile-an-hour speed

22   limit down the alley?

23         A.   Approximately, yes.

24         Q.   Well, you've come to find out you exceeded it

25   or you've never come to find that out?

CHRISTIANSEN & HOWELL

24

1     A.   I did find out that I exceeded it, yes.

2     Q.   Do you disagree with that finding?

3     A.   I do not.

4     Q.   The police report, I believe, notes a bicycle

5   tire mark on your upper push bar.  Do you recall the rear

6   tire of the bike striking your upper push bar?

7     A.   Not the rear tire, no.

8     Q.   Do you recall any part of the bike hitting the

9   upper push bar?

10     A.   Not the upper push bar, no.

11     Q.   Do you have any explanation why there would be

12   a tire scuff mark on your upper push bar?

13          MR. PRAET:  Assumes facts not in evidence.

14   Beyond the scope of this witness.  Lack of foundation,

15   unless you know.  Also calls for speculation.

16          THE WITNESS:  I don't.

17   BY MR. ROZIER:

18     Q.   Okay.  Do you know what part of the body or the

19   bicycle was struck first by your vehicle?

20     A.   No, I don't.

21     Q.   Whatever struck first, was that outside your

22   point of view?

23     A.   Yes, that's correct.

24     Q.   Did the body or the person of Mr. Toscano ever

25   fly up into your windshield?

1    A.   No, sir.

2    Q.   At the point of initial impact, were you on

3  your accelerator, your brake, or neither?

4    A.   At the point of initial impact, neither.

5    Q.   Had you just eased up or released the

6  accelerator an instant before that?

7    A.   Yes, sir.

8    Q.   What was your your purpose in doing that?

9    A.   I saw Mr. Toscano begin to fall.

10   Q.   When you saw Mr. Toscano begin to fall, how far

11  was he from the front of your bumper?

12   A.   Approximately five feet.

13   Q.   Was it your intent to be within five feet of

14  him as you were pursuing him?

15   A.   At that time it was, because he had gotten

16  ready to jump off his bike.  He was going down the alley

17  and he had started to put his left foot down, which

18  normally happens when they jump off the bike.  They put a

19  foot down, then get off and run.  So I had opened my door

20  to get ready to get out with him, and he looked over his

21  shoulder and decided to keep riding.  So I shut my door.

22  And as he started to ride away, his handlebars began to

23  wobble back and forth.

24   Q.   Right.

25   A.   And that's when he began to fall.

CHRISTIANSEN & HOWELL                          26

1    Q.    So you got back in your car and did what,
2    accelerated toward him?
3    A.    Accelerated with him.
4    Q.    Trying to keep up with his speed?
5    A.    Yes, sir.
6    Q.    Got within five feet?
7    A.    As he was falling, yes.
8    Q.    I mean you got within five feet before you had
9    any indication he was falling.  That's about the distance
10   you said when he started to fall.  You're five feet away
11   from him when he starts to fall.
12   A.    When he started to fall, yes.
13   Q.    And then do you believe that he actually did
14   fall before you struck him?  Or did you strike him before
15   he fell?
16   A.    I didn't have a viewpoint of where exactly he
17   was when I initially struck him.
18   Q.    And then how far did your car go further down
19   the alley after striking him?
20   A.    I don't know the exact distance.
21   Q.    And I understand you haven't read the police
22   report and seen those measurements.  Is that right?
23   A.    That's correct.
24   Q.    So you're a witness to the event.  What's your
25   best estimate of how much further the front of your car

CHRISTIANSEN & HOWELL                                    27

1  direction in the heat of a moment.  But this was a

2  prolonged --

3      A.   I don't exactly know that he should be aware of

4  the danger of running -- it's not dangerous to run

5  from -- it's against the law.

6      Q.   Well, how fast were you going down the alley?

7      A.   As fast as his bicycle could do.

8      Q.   Five feet behind him?

9      A.   Not down the entire alley, no.

10     Q.   No, I understand.  But right there at the

11  instant you realized he's falling off his bike, you're

12  five feet behind him going what speed?

13     A.   I was told 19 miles an hour.

14     Q.   Okay.  Is that a danger to Mr. Toscano he

15  should have realized?

16     A.   Yes.

17     Q.   And this whole pursuit, what's the time frame?

18  From his first decision to evade until he's run over,

19  what's the approximate time frame?

20     A.   Maybe a minute, minute and a half.

21     Q.   Certainly enough time for him to deliberate his

22  options?

23     A.   Absolutely.

24     Q.   Do you believe that you did anything wrong that

25  day?

CHRISTIANSEN & HOWELL

30

1    A.   No, sir.

2    Q.   Did your training at the POST academy include

3    the concept that you're supposed to follow the Vehicle

4    Code rules and regulations unless you have your emergency

5    lights or siren on?

6    A.   Yes, sir.

7    Q.   How could you have prevented running over

8    Mr. Toscano?

9         MR. PRAET:   Calls for speculation.   Are you

10   talking about not even chasing him or --

11        MR. ROZIER:   No, no, everyone can say, "I

12   shouldn't have woken up that morning."   Beyond those

13   obvious things --

14        THE WITNESS:   Mr. Toscano could have stopped at

15   the initial stop at Princeton and Glenn.

16   BY MR. ROZIER:

17   Q.   Yes, and that would have prevented his death.

18   I understand.   And you could have elected not to choose

19   to chase him.

20        As you're pursuing him down the alley five feet

21   from him and he starts to fall and you're going 19 miles

22   per hour, is there anything that you believe you could

23   have done to prevent harm to Mr. Toscano?

24   A.   No.

25        MR. PRAET:   Calls for speculation.   Incomplete

CHRISTIANSEN & HOWELL                    31

1    hypothetical.  Are you assuming that Mr. Toscano doesn't

2    fall?  That he should have foreseen Mr. Toscano falling?

3    Or -- it's an incomplete hypothetical.

4            Do you understand the question?

5            THE WITNESS:  No, I don't.

6  BY MR. ROZIER:

7      Q.   Okay.  Are you still doing proactive patrols?

8      A.   No, sir, I'm not.

9      Q.   Why didn't you have your lights and siren on as

10   you went down the alley?

11     A.   I just -- I just never turned them on in the

12   initial -- when I got back in the car from getting out to

13   grab him at Princeton and Harvard -- or at Glenn and

14   Harvard --

15     Q.   Right.

16     A.   -- I never turned them on.

17     Q.   Well, had they been on as you went southbound

18   on Glenn?

19     A.   My back lights were.  Just -- our lights go in

20   three separate switches.  The first switch is just the

21   back lights.  The second switch is the back lights and

22   solid red and blue front.  And the third switch is all

23   lights on.

24     Q.   And all lights is a combination of the first

25   two or other --

CHRISTIANSEN & HOWELL

32

1      A.   Yes, sir.

2      Q.   Okay.

3      A.   Well, all the lights, headlights flashing.

4   Code 3, basically.  Headlights flashing.

5      Q.   All right.  So as you pursued him southbound on

6   Glenn, were any of your lights on?

7      A.   Just the back lights on the light bar.

8      Q.   On the light bar.

9      A.   Yes, sir.

10     Q.   Yellows or whites or what?

11     A.   They're red and blue.

12     Q.   And then when you briefly got out at Glenn

13   and -- what was the intersection?

14     A.   Harvard.

15     Q.   -- Glenn and Harvard, you turned those lights

16   off?

17     A.   I clicked if off, yes.

18     Q.   And then when you reinitiated your pursuit to

19   him and then down the alley, is it just that you forgot

20   to turn them on or you made a decision not to turn the

21   lights back on?

22     A.   It was my decision to not turn them on.  I

23   didn't believe that it was going to turn into a pursuit

24   down the alley.  I honestly believed that he was going to

25   turn into the alley out of my view and jump off his bike.

CHRISTIANSEN & HOWELL                     33

1      Q.   But you did pursue him down the alley?

2      A.   I did.

3      Q.   And so you thought it would be a brief car

4   pursuit followed by a foot chase?

5      A.   Correct.

6      Q.   And then as you proceed down the alley past the

7   backyards of about ten houses, did you become aware that

8   you're now in a pursuit again?

9      A.   Yes.

10     Q.   And did you -- is it something you just didn't

11  think to do?  Or something you consciously decided not to

12  do as to turning on the lights or siren?

13          MR. PRAET:   Interject an objection here.  When

14  you're saying "pursuit," you're talking about a vehicle

15  pursuit or pursuit of a -- as you know, there's a

16  difference in a --

17          MR. ROZIER:   Oh, yes, very good.  I'm talking

18  about your --

19          MR. PRAET:   Chase?

20          MR. ROZIER:   -- your chase of this bicycle that

21  day.

22          You're right.  "Pursuit" has a particular

23  connotation.

24  BY MR. ROZIER:

25     Q.   As you're chasing the bicycle down the alley,

CHRISTIANSEN & HOWELL

34

1   were you intentionally not using lights and siren or

2   accidentally and forgetfully not using lights and siren?

3        A.   It was a forgetful action.  I was paying more

4   attention to his location and what he was doing rather

5   than turning my lights on.

6        Q.   In the past have you chased individuals who got

7   away?

8        A.   Yes, sir.

9        Q.   And what are -- how do they do that?  What are

10  the successful tactics that have been used against you?

11            MR. PRAET:  You're talking about bikes?

12            MR. ROZIER:  Yeah, people on bikes.

13            THE WITNESS:  On a bike you're able to maneuver

14  places that vehicles aren't.  So you may be able to go

15  down a pedestrian pathway that a vehicle can't go down.

16  BY MR. ROZIER:

17       Q.   Okay.  Or they can ditch their bike and hop

18  over a four-foot fence?

19       A.   Right.  But more likely, you're going to take

20  your bike where a vehicle can't go -- through a park,

21  through a pedestrian walkway, something of that nature.

22       Q.   Right.  Do suspects usually take their bike

23  with them or they often ditch their bike?

24       A.   They usually take their bike with them through

25  an area where a vehicle can't go.

CHRISTIANSEN & HOWELL

35

1    Q.   How many times had Mr. Toscano been chased by

2   the police in the past?  You're probably going to tell me

3   you don't know, but I need to know that.

4    A.   I have no idea.

5    Q.   How many bicycles did you chase in a typical

6   shift?

7    A.   In a typical shift?

8    Q.   Yes.

9    A.   It would just depend on the night.

10    Q.   Okay.  Let's average your career.

11    A.   Over a hundred.

12    Q.   Total?  Not per night.

13    A.   Right.  Correct.  Total.

14    Q.   Over a hundred.  Could be a million.  You

15   don't -- you mean 100 to 300?  Or what do you mean?

16    A.   That's a fair statement, 100 to 300.

17    Q.   Was your intent to bump the bike to the ground?

18    A.   No, sir.

19    Q.   Have you in the past ever bumped a bike to the

20   ground?

21    A.   No, sir.

22    Q.   Have you been taught that it would be against

23   procedures to bump a bike to the ground?

24    A.   That's correct.

25    Q.   And what was the instruction in that regard?

CHRISTIANSEN & HOWELL

36

1      A.    It's not a vehicle.  You can't use the PIT

2    maneuver on a bicycle.

3      Q.    What's a PIT maneuver?

4      A.    A Pursuit Intervention Technique.

5      Q.    And how is that brought about with a car?

6      A.    You place the front bumper of your patrol

7    vehicle on the rear quarter panel of the suspect vehicle,

8    and you essentially spin them out.

9      Q.    And as far as vehicle-to-vehicle pursuits, what

10   would be the circumstances that would justify using the

11   PIT maneuver?

12     A.    The pursuit is of dangerous nature and your

13   supervisor sees that it's a necessary action to stop the

14   pursuit.

15     Q.    In other words, more than a traffic infraction?

16     A.    Correct.

17     Q.    Like a crazy driver that's going to blow stop

18   signs, that sort of thing?

19     A.    DUI driver.

20     Q.    DUI.  Okay.  And do you need sergeant approval

21   to do that?

22     A.    Yes.

23     Q.    And that's part of the Visalia Police

24   Department pursuit policy?

25          MR. PRAET:  Or Fresno.

CHRISTIANSEN & HOWELL

37

1        MR. ROZIER:  Sorry.  Fresno Police Department

2   pursuit policy.  Is that right?

3        THE WITNESS:  Yes, sir.

4   BY MR. ROZIER:

5   Q.   And there's no particular policy on chasing

6   bicyclists of a similar nature.  It's not a pursuit

7   policy.  It's not considered a pursuit.  Is that right?

8   A.   That's correct.

9   Q.   So your plan was to coax Mr. Toscano off his

10  bike so you could pursue him on foot?

11  A.   I don't understand how I would coax him off of

12  his bicycle.

13  Q.   By chasing him?  Is there any other way that

14  you're going to apprehend him other than him leaving his

15  bike?  Or stopping?

16  A.   No, sir.

17  Q.   So your intent was that he would eventually

18  either stop or begin a foot escape?

19  A.   That's correct.

20  Q.   Are there any written policies with the Fresno

21  Police Department concerning the proactive patrol?

22  A.   In regards to what about the proactive patrol?

23  Q.   In regards to stopping cyclists.

24  A.   At the time there was not, no.

25  Q.   But there are now?

CHRISTIANSEN & HOWELL                                    38

1    Q.   It does, but knowing the full range of what he

2    might do as you're chasing him, did you realize it might

3    be dangerous to Mr. Toscano?

4    A.   I think that just running from the police in

5    general is dangerous for a suspect.  Not just an alley

6    or -- I think anywhere it is.  Because you're in the

7    mindset of you have to get away, so you're not aware of

8    your surroundings.  It was dangerous for him to ride into

9    an intersection.  He could have been hit by another

10   vehicle.

11   Q.   I guess I'm talking about the danger caused by

12   the vehicle that's on his tail.  Did you realize that

13   your vehicle imposed a danger to Mr. Toscano?

14   A.   Yes, sir.

15   Q.   What did you do after the accident?

16   MR. PRAET:  Vague as to time.  Are you talking

17   about immediately after or after he stopped?

18   MR. ROZIER:  No, at the scene.

19   MR. PRAET:  That's what I'm saying.  After his

20   vehicle came to a stop or when?

21   BY MR. ROZIER:

22   Q.   After you get out of the car, after the

23   accident's happened, what did you do?

24   A.   After I got out of the car, I walked to the

25   back of my patrol vehicle and I knelt down and looked

CHRISTIANSEN & HOWELL

1    Q.   Did you tell him anything about the suspect
2    falling from the bike?
3    A.   I don't remember.
4    Q.   From first entering the alley until you're five
5    feet before impact and you see him seem to fall, had the
6    cyclist gotten off his like?
7    A.   No, sir.
8    Q.   Okay.  This is in that 90 percent of the alley
9    that you covered.  Had he done anything threatening
10   towards you?
11   A.   Not threatening, no.
12   Q.   Had he wobbled or swerved back and forth in the
13   alley?  Anything weird?
14   A.   Not wobbled.  His right foot kept slipping off
15   of the pedal, and he was riding with just one hand
16   because he had his right hand tucked in front of him
17   where I couldn't see it.
18   Q.   Did he have a basket on the bike with, like,
19   stuff in it?
20   A.   I don't remember if he had a basket.
21   Q.   Which hand was he using to guide the steering
22   wheel?
23   A.   His left hand.
24   Q.   I think you told us at some point you suspected
25   he might be using that right hand to, you know, shield

CHRISTIANSEN & HOWELL

44

```
 1    questions.  That was one.
 2          MR. PRAET:  I'll stipulate.
 3    BY MR. ROZIER:
 4        Q.   What would be the elements of vehicular
 5    manslaughter, in your opinion?  Or your training?
 6        A.   Accidental death by a vehicle collision.
 7        Q.   Was this an accidental death?
 8        A.   Yes.
 9        Q.   Was it a vehicle collision?
10        A.   Tech -- yes.
11        Q.   Is there some element that was missing?
12        A.   Not that I know of, no.
13        Q.   So you met all the elements for committing the
14    crime of vehicular manslaughter?
15        A.   I'm sorry, negligence.
16        Q.   Okay.  That would be another element?  Is that
17    right?
18        A.   Yes.
19        Q.   And you believe you were not negligent?
20        A.   I believe I was not negligent, that's correct.
21        Q.   In your training, do you have an understanding
22    whether a motor vehicle can be considered deadly force?
23        A.   Yes.
24        Q.   And it can?  Is that right?
25        A.   Yes, sir.
```

CHRISTIANSEN & HOWELL

1      Q.   Under what circumstances?

2      A.   I don't understand the question you're asking.

3 Under what circumstances is it deadly force?

4      Q.   Yes.

5      A.   If you hit somebody with it, it's deadly force.

6 Intentionally.

7      Q.   Right.  Okay.  So if you had intended to run

8 over Mr. Toscano, then you would admit that this would be

9 a use of deadly force?

10     A.   That's correct.

11     Q.   Have you had any other accidents on the job?

12     A.   No, sir, not that I was the driver.

13     Q.   Good clarification.

14          Do you have any infractions or marks on your

15 driving record for on-duty events?

16     A.   No, sir.

17     Q.   When you chase cyclists, you've chased between

18 100 and 300 in the last -- well, in the four and a half

19 years before this event.  When you catch them, do you

20 usually give them a citation?

21     A.   It all depends on the situation.

22     Q.   You always -- I'm sorry, go ahead.

23     A.   Sometimes they'll get a citation.  Sometimes

24 they'll go to jail.  It depends on the elements of the

25 crime once they're caught.

1      Q.   Your chase of him without license/siren, is

2   that how you usually chase cyclists?

3      A.   Yes.

4      Q.   Do you recall a time when you used lights and

5   siren to chase a cyclist?

6      A.   No, I don't recall.

7      Q.   Would it be fair to say that nearly always

8   you're chasing cyclists with no lights and siren?

9      A.   Yes, that would be safe to say.

10     Q.   And, of course, when you're chasing cyclists

11  without lights and siren, you're trying to overtake --

12  you're trying to go at least as fast as they're going?

13     A.   I don't know that I'm trying to overtake them.

14  I'm trying to keep them in view, waiting for them to jump

15  off their bike.

16     Q.   Okay.  And generally, that it occurs because

17  they're worn out?  Or do you have any idea --

18     A.   They see an avenue of escape on foot.

19     Q.   Okay.  So you want to chase them long enough

20  till you provoke them to jump off and run?

21          MR. PRAET:  Objection in terms of the term

22  "provoke."

23  BY MR. ROZIER:

24     Q.   Yeah, that is a term I need to use.  I mean

25  that's actually your plan, isn't it?  You're trying to

CHRISTIANSEN & HOWELL                    55

1    Q.   Were you responsible for your speed?

2    A.   I was driving, so yes.

3    Q.   Okay.  Not paying attention to the speed you're

4  responsible for and then exceeded the posted speed limit,

5  would you agree that's negligent?

6    A.   No.

7    Q.   Did the car malfunction at all that day?

8    A.   No, sir.

9    Q.   Every movement the car made was the movement

10 you intended it to make?

11   A.   Yes, sir.

12   Q.   It stopped when you wanted to stop?  It

13 accelerated when you wanted it to accelerate?

14   A.   That's correct.

15   Q.   You're the only one that controlled the

16 vehicle?

17   A.   Yes, sir.

18   Q.   And the vehicle ran over Mr. Toscano?

19   A.   Yes.

20   Q.   And you did nothing wrong?

21   A.   Correct.

22   Q.   I'm almost done.

23        MR. ROZIER:  Adam, if you want to jump in here,

24 it's a good time.

25        MR. RUSHING:  Sure.

CHRISTIANSEN & HOWELL                    59

# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF CALIFORNIA

3               FRESNO DIVISION

4                  -oOo-

5    ANGEL KEITH TOSCANO, JR.,        )  CASE NO.
     individually and as             )  1:13-cv-01987-LJO-
6    successor-in-interest to        )  SKO
     Angel Keith Toscano,            )
7    deceased; et al.,               )  (CONSOLIDATED WITH
                                     )  CASE NO. CV F
8                   Plaintiffs,      )  14-0186 LJO SKO)
                                     )
9         vs.                        )
                                     )
10   CITY OF FRESNO, a municipal     )
     corporation; et al.,            )
11                                   )
                    Defendants.      )
12

13

14                  -oOo-

15      DEPOSITION OF MARTHA GALVAN

16           FRESNO, CALIFORNIA

17            APRIL 10, 2015

18                  -oOo-

19

20         CHRISTIANSEN & HOWELL
21       CERTIFIED SHORTHAND REPORTERS
              927 NORTH FULTON
22      FRESNO, CALIFORNIA 93728-3411

23            (559) 268-0266

24   Reported by:                    CERTIFIED
     RONALD C. LAING
25   C.S.R. #5171                    COPY

            CHRISTIANSEN & HOWELL                        1

1    A.    Well, I think -- he got to the alley by the
2    time the police officer was fully turned.  He was already
3    right at the entrance of the alley.
4        Q.    Okay.
5        A.    He was right at the entrance of the alley when
6    I turned to see him.  And the police officer was already
7    fully turned.  Fully turned.
8        Q.    All right.  Then as the police officer went by
9    you, you could hear his engine and it seemed to be going
10   quickly?
11       A.    Yeah.
12       Q.    And let's see what words you used.  And your
13   impression was somewhere along Glenn the police officer
14   got up to 45 miles per hour?
15       A.    Right.
16       Q.    And then there was a -- I think you called it a
17   little screech or a loud screech?
18       A.    A little screech.
19       Q.    So little screech into the alley, and the
20   officer's turning left into the alley.
21       A.    Uh-huh.
22       Q.    Did it fishtail or spin out?
23       A.    No.
24       Q.    And after that, did you hear it further as it's
25   going down the alley?

CHRISTIANSEN & HOWELL

23

1   I have this face like, "Oh, my gosh" and kind of a

2   rolling of the eyes kind of thing.  That was the

3   impression I got.  And I said, "Well, they're going to

4   arrest him for sure."

5       Q.   Let me be real clear here.  The one who looks

6   frustrated is the officer or Mr. Toscano?

7       A.   The officer.

8       Q.   The officer.

9       A.   Yeah.

10      Q.   And you saw him in his squad car as he's

11  passing your house?

12      A.   Yeah.

13      Q.   All right.  I appreciate that.  But what -- if

14  you have an impression of the speed when he's turning

15  into the alley, that's what we're asking now.

16      A.   Oh, no, like I said, I don't know -- I can't

17  tell you like, oh, he was going 50, 60 miles an hour.  I

18  just know he was going really fast for, you know, a zone

19  that we live in.  You know, you're not supposed to go

20  more than 25, 30 miles an hour.  He was going a good 40

21  miles an hour, 40, 45.  And in the distance from that

22  small corner from Harvard to the -- to the alley?

23      Q.   Yes.

24      A.   -- he picked up very quickly.  I do remember

25  seeing that very, very quickly, and he did -- I felt

CHRISTIANSEN & HOWELL                    25

# EXHIBIT C

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF CALIFORNIA

3    FRESNO DIVISION

4    -oOo-

5    ANGEL KEITH TOSCANO, JR.,            )   CASE NO.
     individually and as                 )   1:13-cv-01987-LJO-
6    successor-in-interest to            )   SKO
     Angel Keith Toscano,                )
7    deceased; et al.,                    )   (CONSOLIDATED WITH
                                          )   CASE NO. CV F
8              Plaintiffs,                )   14-0186 LJO SKO)
                                          )
9         vs.                             )
                                          )
10   CITY OF FRESNO, a municipal          )
     corporation; et al.,                 )
11                                        )
               Defendants.               )
12

13                  -oOo-

14

15   DEPOSITION OF DETECTIVE BRIAN ERIC HANCE

16   FRESNO, CALIFORNIA

17   APRIL 9, 2015

18                  -oOo-

19

20

21   CHRISTIANSEN & HOWELL
     CERTIFIED SHORTHAND REPORTERS
22   927 NORTH FULTON
     FRESNO, CALIFORNIA 93728-3411

23   (559) 268-0266

24   Reported by:                         CERTIFIED
     RONALD C. LAING
25   C.S.R. #5171                         COPY

1          MR. PRAET:  Again, that assumes facts not in
2    evidence and also misstates his testimony he was that
3    distance when the bike was upright.
4          MR. ROZIER:  Okay.  I think that's exactly what
5    he said, but it assumes that.  It assumes correct
6    information.
7    BY MR. ROZIER:
8        Q.   That's not maintaining a safe distance, is it?
9        A.   Correct.
10       Q.   And that's why you recommended that he be --
11   that it be turned over to the D.A.'s Office for possible
12   prosecution for vehicular manslaughter?
13       A.   Sent over for their review and their
14   determination, yes.
15       Q.   Right.  Because you viewed a possibility of
16   negligence on behalf of the officer?
17       A.   Well, I viewed he was at fault in a Vehicle
18   Code violation or in a vehicle collision, which resulted
19   in the death of someone.  So that is the reason it was
20   sent over.
21       Q.   He was a primary collision factor?
22       A.   Yes.
23       Q.   Did you list a secondary collision factor in
24   your report?
25       A.   Not on the second page, but in the report I

CHRISTIANSEN & HOWELL                                    28

1    referred to the intoxication of the bicyclist, which

2    would be a violation of the California Vehicle Code.

3        Q.   That connected to or caused this accident?

4        A.   No, not directly caused, but is an associated

5    factor, him being intoxicated while riding the bicycle.

6        Q.   So we're left with the single cause for the

7    collision, that's Officer Lyon's driving?

8        A.   The primary cause, yes.

9        Q.   And when a person causes -- the primary cause

10   of a death involving a motor vehicle, do you generally

11   refer it to the D.A.'s Office for possible criminal

12   charges?  Or is this unusual for some reason?

13       A.   If fault results in the death, yes, depending

14   on -- depending on the level of the violation, yes, it

15   will go to the District Attorney's Office and/or an

16   arrest.

17       Q.   And in this case the level of the violation was

18   such that you thought it warranted referral?

19       A.   On a misdemeanor.  Yes.

20       Q.   And that was what you specified in your

21   referral?  Subsection misdemeanor?

22       A.   Yes.

23       Q.   Now, just looking at -- taking a step back and

24   looking at this accident generically, we have a car

25   chasing a bike down most of the length of an alley.  The

CHRISTIANSEN & HOWELL                              29

1    bicyclist either intentionally or accidentally tries to

2    get off the bike, of course, laying the bike down.  And a

3    police car runs him over and goes beyond the point of

4    impact some distance.  And I take it you're not generally

5    supposed to run people over and kill them.  In a broad

6    brush, that's not supposed to happen.

7         A.   Correct.

8         Q.   And there's no one in control of that vehicle

9    other than Officer Lyon.

10             MR. PRAET:  The bicycle or the vehicle?

11             MR. ROZIER:  The vehicle, the car.

12             THE WITNESS:  Correct.

13   BY MR. ROZIER:

14        Q.   And the vehicle, he's supposed to -- there's no

15   report to you of any malfunction of the vehicle, such as

16   brakes that didn't work.  Right?

17        A.   Correct.

18        Q.   And the vehicle was looked over after the

19   accident and came up clean?

20        A.   Mechanically speaking, yes.

21        Q.   Mechanically.  Adequate tread on the tires,

22   that sort of thing.

23        A.   Yes.

24        Q.   So operating a mechanically suitable vehicle

25   that's operating properly, Officer Lyon is the only

1  person who applied the accelerator on that vehicle in the
2  alley that day, as you understand it.  Correct?
3      A.  Yes.
4      Q.  And we can quibble over exactly how much
5  distance they had between them or how suddenly the fall
6  was, but the fact remains that a, what, 3500-pound
7  vehicle ran over Mr. Toscano, who had been riding his
8  bike?
9      A.  Yes, away from the police car.
10     Q.  I understand that.  And that's not a good
11 thing.
12          And so you have -- well, down that alley that
13 he was being chased by the police car, Mr. Toscano, did
14 he have escape routes to the side, or were they mostly
15 fenced off by the local residents?
16     A.  A lot was fenced off, but there were open areas
17 of damaged fencing, and I want to say one particular
18 residence had no fencing.  It looks like they were in the
19 process of rebuilding a fence.
20     Q.  Okay.  So at some point he may have had an
21 opportunity, if he could swing wide enough or quick
22 enough, to ditch to the side?
23     A.  Yes, he had the opportunity to do that, yeah.
24     Q.  But generally, Mr. Toscano was being funneled
25 down an alley with few escape routes?

1      A.   Yes, sir.

2      Q.   That's what you were told by Webb, Officer

3  Webb?

4      A.   Yes, and it's in quotes, so that's exactly what

5  he told me.

6      Q.   All right.  And did you find any evidence that

7  the car had slid before, for example, striking the

8  bicycle?

9      A.   No, not on my drawing, no.

10     Q.   Did you find any evidence on your drawing of

11  the car sliding before it struck the person of

12  Mr. Toscano?

13     A.   No.

14     Q.   Can we conclude that loose gravel or unexpected

15  sliding had nothing to do with this impact?

16     A.   No.

17     Q.   Because?

18     A.   Well, pre-acceleration, the tire marks on the

19  alley are tire imprints, which is indicative of a rolling

20  tire.

21     Q.   Right, rather than one that's sliding.  I

22  understand.  We've ruled out any concrete evidence of

23  sliding before either of the impacts.  I think what we

24  have here, the implication here, when someone says, "My

25  car slid and the guy went underneath," is that they're

CHRISTIANSEN & HOWELL                        54

1    braking.  They're trying, but it doesn't catch, like
2    unexpectedly slid, hits travel, hits dirt.  Those things
3    happen.  There's no evidence that even happened.
4         A.   Well, there's no evidence that brake was
5    applied to the point of a non-rotating tire.  Correct.
6         Q.   Right.  Did the vehicle have antilock brakes?
7         A.   Yes.
8         Q.   Do antilock brakes skid and leave a mark?
9         A.   They will leave tire marks on the roadway, but
10   they are very faint and they disappear after a while.
11        Q.   Right.  Did you look for some of those?
12        A.   Well, this was dirt, so I don't know how much
13   it would leave in the dirt and rock and gravel.
14        Q.   But if they're catching like antilock brakes
15   are supposed to, then again, you would have evidence of
16   sliding.
17        A.   Maybe for a very brief moment in time.
18        Q.   Okay.  I understand.  I'm almost done.
19             I understand the vehicle event download -- the
20   event data recorder in the vehicle didn't record anything
21   because it didn't hit something solid or fast enough to
22   wake up the system, like it wouldn't have activated air
23   bags?
24        A.   Well, yes and no.
25        Q.   Okay.

CHRISTIANSEN & HOWELL                                        55

1    A.   This 2008 Dodge Charger does not record

2  non-deployment data.  So if this collision wasn't enough

3  to wake up the air bag module to determine whether or not

4  to deploy, in this case not deploy, this car would not

5  record the data.

6    Q.   All right.

7    A.   In 2009 non-deployment data began being

8  recorded.

9    Q.   That is more precise, kind of what I meant.

10 Very good.

11       Let's go to page 54 of your report.  146 that

12 we're working off of.  Toward the bottom.  I think I

13 understand this, but it sounds a little backwards from

14 what I understand.  I want to make sure.  That last

15 paragraph under collision description, it talks about the

16 bicycle being at an approximate 60-degree lean angle.  I

17 think we've established that 60 degrees is measured from

18 the ground upwards, not of 60 degrees from upright toward

19 the ground.  Is that right?

20   A.   Right.  He was 30 degrees off 90.  What we

21 talked about earlier.

22   Q.   Yes, very good.  And it's your understanding

23 Officer Lyon did not have any emergency siren or lighting

24 activated in the alley.  Is that right?

25   A.   That's correct.

CHRISTIANSEN & HOWELL                    56

1  Q. And he exceeded the prima facie speed limit of

2 15 miles per hour in the alley?

3  A. Yes, at some point in the alley he did, yes.

4  Q. And besides that, he's chasing a bicyclist

5 close enough that when the bicyclist falters, he runs him

6 over.  All those facts combine to lead to your conclusion

7 that there was a -- that he was the primary collision

8 factor of the accident.  I'll just say that.  Is that

9 right?

10  A. Yes.  We already talked about that.

11  Q. Yeah, we did.  Did any -- did you take any

12 criticism from the department for recommending that it be

13 referred to the D.A.'s Office?

14  A. Absolutely not.

15  Q. Did anyone review and sign off on your report?

16  A. Yes.

17  Q. And who signed off on it?

18  A. There would be my sergeant.

19  Q. What's his name?

20  A. Sergeant Dave Gibeault.  G-i-b-e-a-u-l-t.

21  Q. Anyone else?

22  A. The report was reviewed by California Highway

23 Patrol MAIT.

24  Q. Did they agree with your conclusion?

25  A. Yes.

1     Q.   And is that in writing somewhere?  I mean is
2  there a signature line for that?
3     A.   No.
4     Q.   How do you know they reviewed it?
5     A.   Because I took it over to them and sat with
6  them.
7     Q.   And discussed with them your conclusions?
8     A.   Yes.
9     Q.   And they agreed?
10    A.   Yes.
11    Q.   And let's be real specific.  They agreed on
12  your primary collision factor as stated in the report?
13    A.   Yes.
14    Q.   Who was it that agreed?  Who were you talking
15  to?
16    A.   Officer Robert Shaw was the primary
17  investigator that was assisting me.
18    Q.   That's one long name.  Right?
19    A.   Robert and then Shaw.
20    Q.   Oh, two names.  Sorry.  And is he a higher-up
21  at the CHP?
22    A.   He's a MAIT investigator.
23    Q.   Okay.  And I understand during your
24  investigation they were standing by sort of to oversee
25  it?  Not oversee it, to witness it?

1    A.   Yeah, we brought them in because we didn't want
2  to be accused of investigating our own and not, you know,
3  investigating all aspects of this.  Because we knew we
4  would probably be somewhere like here.  And, therefore,
5  we would have a non-interested party, being the State
6  Highway Patrol, shadowing us.
7    Q.   And when they shadow you, do they tell you what
8  to be sure and photograph or what to be sure and do?
9    A.   We are independent of them.  We do our job the
10  way they do their job.  And if there was any input at the
11  scene, I'm sure they gave it.  But I was not at the scene
12  with them.  I was conducting interviews.
13    Q.   All right.  Did you go to the scene while the
14  car was still there?
15    A.   Of course, I did.
16    Q.   Was the highway patrol there at that time?
17    A.   Yes.
18    Q.   Did you take measurements and locate diagram
19  points?
20    A.   I inspected the scene, spoke with my partner,
21  what I found at the scene.  We were all on the same page,
22  in agreement.  My partner, and with the assistance of CHP
23  MAIT and/or a couple of traffic officers, processed the
24  scene while I conducted interviews at headquarters.
25    Q.   All right.  I didn't understand that.  Which

1  partner?

2      A.    Partner at the time, Jason Musser, M-u-s-s-e-r.

3      Q.    When you came up with a primary collision

4  factor as being one of your fellow officers, you knew

5  that you were doing so representing the Fresno Police

6  Department?

7      A.    I knew I was representing the Fresno Police

8  Department?

9      Q.    Right.  You were the one assigned to

10 investigate and determine that fact?

11     A.    Oh, of course.

12     Q.    You and your sergeant who looked it over --

13 Sergeant Dave Gibeault?

14     A.    Gibeault.

15     Q.    -- had looked over the report by that time, and

16 the CHP, and all were in agreement that the primary

17 collision factor would affect one of your own officers?

18     A.    Yes.

19     Q.    Probably shows bias as kind of the other way.

20 Appreciate that.  I'm not claiming anything wrong.

21           Have the procedures changed, of the department,

22 for chasing cyclists since this incident?

23     A.    You know, I don't know if they've changed, but

24 I do know -- I think an advisement was put out to proceed

25 with caution when contacting bicyclists.

CHRISTIANSEN & HOWELL                    60

1    Q.   For the safety of both the officer and the
2  cyclist?
3    A.   Yes.
4    Q.   Was there any issue of alleys or chasing down
5  alleys?
6    A.   Not to my recollection.
7    Q.   And you called that a what, an advisement?
8    A.   Yeah, I seem to recall receiving like a
9  briefing item or something to that effect, take caution
10  with bicyclist contacts.
11        MR. ROZIER:  All right.  Good, that's all.
12  Thanks for coming in.
13        THE WITNESS:  Yes, sir.
14        MR. SAHLIN:  I have a few questions.
15                      -oOo-
16                   EXAMINATION
17  BY MR. SAHLIN:
18    Q.   From the perspective of the officer inside the
19  car, this angle we're talking about, was the bicyclist to
20  his right or to his left?
21    A.   It would be, from the officer's perspective, to
22  the right.
23    Q.   So towards the center of the alley?
24    A.   Yes, sir.
25    Q.   Now, you did have a map of how the pursuit

1    started.  Correct?  In other words, you gave us a

2    description that it went southbound on Glenn to Harvard,

3    then back northbound on Glenn into the alley.  Correct.

4         Q.   Yes, that's what I was told how it happened,

5    yes.

6         Q.   Do you have an approximate estimate of how long

7    that is in -- how long that distance is?

8         A.   Well, from what point?  I'm sorry.

9         Q.   From the start until the impact.

10         MR. ROZIER:  You have different start points.

11   You mean from --

12         MR. SAHLIN:  Well, I mean from the time he

13   initiated following Mr. Toscano.

14         THE WITNESS:  Okay.  Well, Princeton to Harvard

15   is one residential city block.  And then from Harvard and

16   Glenn is where the bicyclist made his evasive movements

17   and took off.  So in that location, half of a city block

18   to the alleyway, and then westbound on the alleyway.

19   BY MR. SAHLIN:

20         Q.   Okay.  And how far down the alley?

21         A.   The alleyway, I believe, is 625 feet.

22         Q.   Any reason to believe that the bicyclist was

23   more robust and more energetic after having ridden that

24   distance?

25         MR. PRAET:  Vague as to what you mean "robust."

1  BY MR. SAHLIN:

2      Q.  Did he have more energy?  He hadn't worn

3  himself out?

4          MR. PRAET:  From the meth or from the riding?

5          MR. SAHLIN:  No, from the riding.

6          MR. PRAET:  Oh.

7          THE WITNESS:  I would be tired after that

8  distance, but I'd have no -- I can only speculate as to

9  his endurance.

10  BY MR. SAHLIN:

11      Q.  And I would assume that there's no reason to

12  believe that his car would ever get tired.  Correct?

13      A.  Well, it is a Dodge, but correct.

14      Q.  So absent Mr. Toscano ditching the bike and

15  going into a position where the car cannot follow,

16  meaning if he were to stay on surfaces, alleys, roads,

17  whatever, there's no fear that he could outrun the car?

18          MR. PRAET:  Assuming in your hypothetical that

19  he doesn't foot bail or --

20  BY MR. SAHLIN:

21      Q.  That's what I said.  If he doesn't bail and go

22  somewhere the car can't go.  There's no fear he can

23  outrun the car?

24      A.  Correct.

25      Q.  So is there any logic in following so closely

CHRISTIANSEN & HOWELL                    63

```
 1   as five feet so as not to lose him?
 2          MR. PRAET:  Well, at what point is he following
 3   five feet?  You're talking about as he's falling.
 4          MR. SAHLIN:  In the alley.  He was following
 5   five feet --
 6          MR. PRAET:  No, he was only five feet right
 7   prior to him going down.  He wasn't five feet all the way
 8   back in the alley.
 9          MR. ROZIER:  Fair enough.  Right when he
10   notices the problem.
11          MR. PRAET:  Right, as he notices him going
12   down, at that point the distance closed to five feet.
13          MR. SAHLIN:  All right.
14          MR. ROZIER:  Or it always was, but he's falling
15   down --
16          MR. PRAET:  Wait a second.  So what's the
17   question?
18   BY MR. SAHLIN:
19     Q.   The question is, do you think the officer ever
20   had a fear that he had to continue to get that close to
21   him or he was going to lose him?
22          MR. PRAET:  Calls for speculation.
23          Do you know what the officer was thinking?
24          THE WITNESS:  No, I do not.
25   BY MR. SAHLIN:
```

1    Q.  But with the power of the car, the bicycle is
2  not going to outrun him.  Correct?
3        MR. PRAET:  That's already been asked and
4  answered.  Now you're arguing.  Is there a question?
5        MR. SAHLIN:  For now, that's all.
6        MR. ROZIER:  All right.  I have another
7  question.
8        MR. PRAET:  Okay, Columbo.
9        MR. ROZIER:  I think that's almost a
10  compliment.
11                    -oOo-
12              FURTHER EXAMINATION
13  BY MR. ROZIER:
14    Q.  In your work with the Fresno Police Department,
15  have you ever investigated another accident where a
16  police car has struck a bicycle?
17    A.  Yes, I have.
18    Q.  How many times?
19    A.  Well, now I'm sure there's going to be more
20  than I say, but two come to mind.
21    Q.  What were the facts of the first one?
22    A.  The first one was a case somewhat similar to
23  this where an officer is trying to stop a bicyclist that
24  was not yielding to him.
25    Q.  It was on a public road or alley?  Or what kind

CHRISTIANSEN & HOWELL                          65

1  of --

2     A.   It was on a public road in an industrial area.

3     Q.   Was anyone injured?

4     A.   Not from the impact, no.

5     Q.   How about from falling after the impact?

6     A.   No.

7     Q.   How about at all?

8     A.   There was a subsequent shooting from that.  And

9  I don't know if he was injured or grazed.  But in this

10  auto-bicycle incident, that bicycle was straight up and

11  down, upright, and was lodged underneath the front push

12  bar, which was different than this case.

13     Q.   No, I understand.  But if it's upright, how is

14  it lodged under the bar?

15     A.   The rear tire is lodged underneath that cross

16  member.

17     Q.   In an upright position?

18     A.   Yes.

19     Q.   In that case the body went over?

20     A.   No.  He may have hit the push bumper, but it

21  was a low speed and he took off running.  It was a

22  smaller bicycle.

23     Q.   It was not either of these two officers?

24     A.   No.

25     Q.   Approximately, what year was that?

CHRISTIANSEN & HOWELL

66

# EXHIBIT D

1              UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF CALIFORNIA

3                FRESNO DIVISION

4                   -oOo-

5  ANGEL KEITH TOSCANO, JR.,   )  CASE NO.
    individually and as        )  1:13-cv-01987-LJO-
6  successor-in-interest to   )  SKO
    Angel Keith Toscano,       )
7  deceased; et al.,         )  (CONSOLIDATED WITH
                         )  CASE NO. CV F
8              Plaintiffs,  )  14-0186 LJO SKO)
                         )
9      vs.                )
                         )
10  CITY OF FRESNO, a municipal  )
    corporation; et al.,       )
11                        )
              Defendants.  )
12

13                   -oOo-

14

15          DEPOSITION OF OMRI OROZZO

16           FRESNO, CALIFORNIA

17            APRIL 10, 2015

18                   -oOo-

19

20

21          CHRISTIANSEN & HOWELL
          CERTIFIED SHORTHAND REPORTERS
22            927 NORTH FULTON
          FRESNO, CALIFORNIA 93728-3411
23
             (559) 268-0266
24  Reported by:                 CERTIFIED
    RONALD C. LAING
25  C.S.R. #5171             COPY

1  engine or screeching or anything?

2      A.   No, just the revving of the engine.

3      Q.   Okay.  Did you see the officer as he passed by

4  you?

5      A.   I didn't see -- no, I didn't see his face.

6      Q.   Okay.  Did the vehicle slow down as it made the

7  turn into the alley, or maintain speed?

8      A.   It had to because it's pretty, you know, like

9  the entrance of the alley is pretty -- not small, but he

10 was going really fast, so he pretty much slowed down,

11 then went in there.

12     Q.   Okay.  And did you hear or see any screeching

13 of fishtailing as he entered the alley?

14     A.   I saw a little fishtailing because he kind of

15 took it a little fast, not completely, because at 35

16 miles per hour he would have crashed, but yeah.

17     Q.   All right.  You talked kind of fast.  I want to

18 make sure I understand what you just said.  I think you

19 said that although you conclude he would have had to slow

20 down from 35 miles an hour to even make the turn, he was

21 still going a little fast, although lower than 35.

22     A.   Yeah.

23     Q.   And then when he disappeared into the alley,

24 from that point till impact, did you see anything?

25     A.   No.  I didn't see -- I just saw the dust.

CHRISTIANSEN & HOWELL                           15

1   the alley.  Did you see the cyclist enter the alley?

2       A.   Yes.

3       Q.   And was the car behind it at some point?

4       A.   No.  By the time the cyclist turned into the

5   alley, disappeared, the cop finished making the U-turn.

6       Q.   All right.  So they're just a half a block

7   apart or whatever that distance is.

8       A.   Yes.

9       Q.   From Harvard to the alley.

10           And then the cyclist disappears down the alley.

11  And that's the last you saw of him before the accident?

12      A.   Correct.

13      Q.   And then you see the officer pass by you at

14  35 miles per hour, perhaps slow a little at the entrance

15  to the alley, kick up some dust and disappear from your

16  view?

17      A.   Yes.

18      Q.   Did you hear an impact?

19      A.   No.

20      Q.   Did you hear the officer's car revving or

21  making any noise after it entered the alley?

22      A.   Yes.

23      Q.   What did you hear?

24      A.   Revving the engine.

25      Q.   Was it increasingly loud or just kind of the

1  same amount as it passed you?

2      A.   No, it was really loud.

3           THE REPORTER:  It was what?

4           THE WITNESS:  Loud.

5  BY MR. ROZIER:

6      Q.   I want you to -- I think you said it's really

7  loud.

8      A.   Yes.

9      Q.   And did you mean to express to us that it

10 seemed to be a more vigorous acceleration down the alley

11 than it had been when it passed you on Glenn?

12     A.   Yes.

13          MR. PRAET:  Objection, leading.

14 BY MR. ROZIER:

15     Q.   How did you come to find out there had been an

16 accident?

17     A.   Well, I waited two, three seconds, then I ran

18 down to the alley, to this entrance to the alley.

19     Q.   All right.  Very good.

20     A.   And then --

21     Q.   I understand your wife went inside with the

22 baby.

23     A.   Yes.

24     Q.   You ran to the alley.  What did you see?

25     A.   I just saw the patrol car.  They stopped.  I

# EXHIBIT E

PREPARED ESPECIALLY FOR

JOHN L. ROZIER, ESQ.

CERTIFIED COPY

CONDENSED TRANSCRIPT

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

-oOo-

| | |
|---|---|
| ANGEL KEITH TOSCANO, JR., individually and as successor-in-interest to Angel Keith Toscano, deceased; COLE TOSCANO, individually, and as successor-in-interest to Angel Keith Toscano, deceased by his mother and Guardian Ad Litem, KIMBERLY HENSON,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CITY OF FRESNO, a municipal corporation; JERRY DYER, individually and in his capacity as Chief of Police for the City of Fresno; DOES 1 through 50, inclusive; and nominal defendants DOES 51 through 60, inclusive,<br><br>                    Defendants. | Case No. 1:13-cv-01987-SAB<br>Member Case: 1:14-cv-00186-SAB |

Fresno, California                                June 1, 2015

-oOo-

## DEPOSITION OF JOSEPH GOMEZ

-oOo-

Reported By:
Anna Estrada
C.S.R. No. 7958



1326 West Herndon Avenue
Suite 101
Fresno, California 93711

KIM THAYER & ASSOCIATES
CERTIFIED COURT REPORTERS

559.221.9000
fax 559.221.9090
www.thayerreporting.com

*Deposition of Joseph Gomez*

### Page 44

1    A. Um-hum, yes. You want this back?

2    Q. Oh, thank you. Yes. Can we take a break for a few

3 minutes just to review? I think that's pretty much all I

4 have for you.

5    A. Okay.

6    Q. I appreciate it. Thank you, Mr. Gomez.

7    (Recess taken.)

8    MR. RUSHING: If we can go back on the record.

9    I am at this time done with my questions. I'll put

10 it over to counsel for the other plaintiffs, Mr. Rozier.

11    -oOo-

12    EXAMINATION BY MR. ROZIER

13    Q. Thank you. I don't have too much, officer. I

14 appreciate your time.

15    Now, you mentioned that were a police officer in a

16 patrol car to strike a pedestrian with a car intentionally,

17 it would be use of deadly force.

18    A. Yes, I did.

19    Q. And that would need to be analyzed under those

20 rules whether it's permissible?

21    A. Yes.

22    Q. And I assume the same thing works for an officer

23 striking a person on a bicycle?

24    A. Intentionally, yes.

25    Q. Right.

### Page 45

1    A. Use of deadly force.

2    Q. Right. There is no training in the department that

3 permits trying to disable a bicycle by bumping it, knocking

4 it to the ground?

5    A. No.

6    Q. To do so would equate with use of deadly force, and

7 it would only be justified when protection of life and that

8 sort of thing, like any use of deadly force?

9    A. Yes.

10    Q. I understand the officers received training on

11 trying to avoid skidding on, you know, dirt surfaces, that

12 sort of thing?

13    A. That's correct.

14    Q. And they know that they're supposed to know their

15 reaction of their vehicle on different road surfaces.

16    A. Yes, always be cognizant, aware of that, always be

17 aware of that, the stopping distance of your vehicle. That's

18 in your training.

19    Q. And if an officer is properly trained then, for

20 example, in this case if Officer Lyon is properly trained,

21 then he would generally know the increased stopping distance

22 in a dirt alley?

23    MR. PRAET: Assuming that he's familiar with the

24 coefficient of friction and the road surface and all the

25 conditions?

### Page 46

1    MR. ROZIER: Q. Or if he's in an alley that's not

2 pavement, yeah.

3    MR. PRAET: Well, are you asking him a

4 hypothetical?

5    MR. ROZIER: Okay. Let's go hypothetically, yes.

6    Q. I think it is appropriate to keep this more

7 hypothetical.

8    A. Um-hum.

9    Q. Because you are not the expert on this case.

10    But the officers in general are trained to

11 anticipate longer stopping distances on other than solid

12 pavement?

13    A. That's discussed in the lecture, yes.

14    Q. All right. And is there any policy at all that was

15 in effect at the Fresno Police Department on the date of the

16 subject incident as to the gap that a patrol car should keep

17 between the front of the car and a cyclist that he is chasing?

18    A. No.

19    Q. Are there any general guidelines about gaps to

20 maintain?

21    A. The only one if you are talking about policy is in

22 the vehicle pursuit policy, but it wouldn't apply here

23 because this is not a pursuit. This incident was not a

24 pursuit, vehicle pursuit.

25    Q. Let's see if we can find any parallels, though.

### Page 47

1    What is your understanding of the gap to be

2 maintained while pursuing a vehicle?

3    A. That you can stop in time if they hit the brakes

4 abruptly in a vehicle pursuit, right? Yes.

5    Q. So except where you are trying to intentionally

6 bump the car to do a PIT maneuver, the requirement if you are

7 chasing someone who is in a car is to keep enough distance

8 back that you can stop should they stop suddenly?

9    A. I didn't hear the last part.

10    Q. In the event that the suspect suddenly stops, you

11 can?

12    A. Keep that cushion?

13    Q. Yes.

14    A. Yes.

15    Q. Okay. All right. Is there any written policy

16 which would prevent -- this one may be obvious. Which would

17 prevent an officer from intentionally running over a cyclist?

18 Which policies would come into play there?

19    MR. PRAET: Is that a specific policy, don't run

20 over people in bicycles?

21    THE WITNESS: You are talking about intentionally?

22    MR. ROZIER: Q. Yes.

23    A. Well, that would be use of force, so that would

24 fall under use of force, yeah.

25    Q. All right. So there is a policy. Thank you.

*Deposition of Joseph Gomez*

Page 48

1  A. But not specific about a bike.
2  Q. I understand. And I take it, an officer is also
3  not supposed to under the policy of the Fresno Police
4  Department negligently run over a cyclist?
5  A. No.
6  Q. And which policy would that come under?
7  A. That would be the Vehicle Code.
8  Q. What section?
9  A. 22350.
10 Q. And what's the nature of that Vehicle Code Section?
11 A. Unsafe speed for prevailing conditions.
12     MR. ROZIER: Thank you. That's all I have.
13     THE WITNESS: You're welcome.
14     MR. PRAET: Okay.
15     MR. RUSHING: We will stipulate that the original
16 transcript go to your office.
17     MR. PRAET: That's fine.
18     MR. RUSHING: All right. And is 30 days enough?
19     MR. PRAET: Sure.
20     MR. RUSHING: Thirty days for the deponent to
21 review, make any corrections. If none are made within the
22 30 days, it's deemed waived. We'll use the original.
23     But if the original is lost or otherwise destroyed,
24 a certified copy can be used in lieu thereof.
25     MR. ROZIER: I agree.

Page 49

1     MR. PRAET: So stipulated.
2     MR. ROZIER: All right.
3     (The deposition concluded at 11:20 a.m.)
4                    -o0o-
5          I declare under penalty of perjury under the laws
6 of the State of California that the foregoing is true and
   correct.
7
8  Executed in              , California on _____, 2015
9
10
11             _____
12             JOSEPH GOMEZ
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 50

1  STATE OF CALIFORNIA )
2  COUNTY OF FRESNO    )
3      I, ANNA ESTRADA, a Certified Shorthand Reporter of the
4  State of California having offices located at Fresno,
5  California, do hereby certify:
6      THAT the witness in the foregoing deposition, named
7  JOSEPH GOMEZ, was by me duly sworn to testify to the truth,
8  the whole truth and nothing but the truth for the taking of
9  the testimony herein;
10     THAT said deposition was reported in shorthand by me at
11 the time and place above stated and thereafter transcribed
12 under my direction and control.
13     I FURTHER CERTIFY that I am not interested in the
14 outcome of said action, nor connected with, nor related to
15 any of the parties in said action or to their respective
16 counsel.
17
18
19
20
21
22         ANNA ESTRADA C.S.R. No. 7958
23
24
25