1   JOHN L. ROZIER – SBN 103059
2   NELSON & ROZIER
    3924 West Caldwell Avenue, Suite A
3   Visalia, CA 93277
4   Telephone:  (559) 713-0159
    Facsimile:  (559) 713-0166
5
6   Attorneys for Plaintiffs,
    ANGEL KEITH TOSCANO, JR., individually
7   and as successor-in-interest to Angel Keith
    Toscano, deceased;
8   STEVEN WADE TOSCANO, individual and
9   as successor-in-interest to Angel Keith Toscano,
    deceased, by his mother and Guardian Ad Litem,
10  KIMBERLY HENSON; KIMBERLY
11  HENSON as successor-in-interest to heir
    COLE TOSCANO, now deceased
12

13              **UNITED STATES DISTRICT COURT**

14        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

15                       **FRESNO DIVISION**
16

17
    ANGEL KEITH TOSCANO, JR.,            CASE NO. 1:13-cv-01987-LJO-SKO
18  individually and as successor-in-interest to )
    Angel Keith Toscano, deceased; STEVEN )  (CONSOLIDATED WITH CASE NO. CV
19  WADE TOSCANO, individually and as )       F 14-0186 LJO SKO)
20  successor-in-interest to Angel Keith )
    Toscano, deceased, by his mother and )     **DECLARATION OF**
21  Guardian Ad Litem, KIMBERLY )              **JEFFREY A. MARTIN**
22  HENSON; KIMBERLY HENSON as )
    successor-in-interest to heir COLE )
23  TOSCANO, now deceased; ANTHONY )
24  KEITH TOSCANO, JULIAN MATTHEW )
    TOSCANO, ANGEL INFINITY )
25  TOSCANO, and JIMMY LEE LONG, )
    Minors, by and through their Guardian Ad )
26  Litem, SYLVIA MORENO )
27
28          Plaintiffs,
    _____

1   vs.

2

3   CITY OF FRESNO, a municipal
    corporation; Jerry Dyer, individually
4   and in his capacity as Chief of Police for
5   the City of Fresno; OFFICER JAMES
    LYON; OFFICER KENNETH WEBB;
6   and DOES 1 through 50, inclusive,

7
                Defendants.
8

9   _____

10      I, JEFFREY A. MARTIN, declare as follows:

11

12      1. I am the police practices expert hired by the Plaintiffs.

13      2. I issued a Rule 26 expert witness report dated July 1, 2015.

14      3. My statements, findings, opinions and conclusions contained in the report are truthful

15  and accurate based upon my experience, training, and knowledge of the facts of this case.

16      4. My statements, findings, opinions and conclusions contained in the report follow two

17

18  separate analyses: one being that Defendant Officer James Lyon intentionally struck Mr.

19  Toscano who was fleeing on his bicycle, the other being that the collision was unintentional.

20      5. My opinions and conclusions based upon the intentional-act scenario are that Officer

21  James Lyon had probable cause to stop Mr. Toscano for committing two vehicle code violations

22

23  and probable cause to arrest Mr. Toscano for the crime of resisting and delaying Officer Toscano

24  in the performance of his duties.  The use of the police vehicle being driven by Officer Lyon at

25  approximately 19 miles per hour to intentionally collide with Mr. Toscano would have been

26  inconsistent with the actions of a reasonable and trained police officer. Officer Lyon suspected

27  Mr. Toscano of only violating the two vehicle code infractions, Mr. Toscano's flight was on a

28

                Declaration of Plaintiff's Expert Jeffrey A. Martin - 2

bicycle and did not pose a threat to Officer Lyon or the public, and Officer Lyon did not articulate that Mr. Toscano was armed or dangerous.

6. My opinions and conclusions under the unintentional-act scenario are that Officer Lyon was following Mr. Toscano too closely for the speeds, road conditions, and overall circumstances. Therefore, Officer Lyon was not driving with the requisite due regard for Mr. Toscano's safety. This would not have been mitigated even if there were substantial evidence that Officer Lyon had been displaying the red light or sounding the siren on his police car. Also, the decision by Officer Lyon to continue driving forward once he realized that Mr. Toscano was underneath his patrol car created additional danger to Mr. Toscano.

7. Officer Lyon's training in emergency vehicle operations was in compliance with the standards established by the California Commission on Peace Officer Standards and Training.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of July 2015 in San Carlos, California.

Jeffrey A. Martin

# EXHIBIT 1

1    <u>**Angel Keith Toscano, Jr., et al. v. City of Fresno, et al.**</u>
2                                    **and**
3    <u>**Anthony Keith Toscano et al. v. City of Fresno, et al.**</u>
4
5       **United States District Court (Eastern District of California)**
6        **Nos. 1:13-cv-01987-LJO-SKO and 1:14-at-00088, respectively.**
7
8           **Interim Report of Expert Witness Jeffrey A. Martin**
9                        **Pursuant to Rule 26(a)(2)(B)**
10
11       <u>**IDENTIFICATION AND QUALIFICATIONS OF EXPERT WITNESS**</u>
12
13       My full name is Jeffrey Alan Martin. I am a retired police sergeant from the San Jose,
14   California Police Department. I currently divide my time between providing consulting and
15   expert witness services and teaching. I am a former labor relations attorney and represented
16   public safety personnel in administrative matters.  I also worked as an author of "Daily Training
17   Bulletins" for Lexipol, LLC, regarding various practices including the use of force, search and
18   seizure, and other police practices.
19       I was promoted to sergeant in 1995 worked in the Patrol Division, the Administrative
20   Unit of the Bureau of Field Operations as the Training Coordinator, the Airport Division, and as
21   a supervisor in the Training Division.  As a patrol supervisor, I investigated and documented
22   several uses of force by officers, whether as a matter of routine or due to citizen complaints.
23       Prior to that I was a police officer and my assignments included Patrol, the Parks
24   Enforcement Unit, Field Training Officer Program, and as an investigator in the
25   Narcotics/Covert Investigations (NCI) Unit.  I served in the NCI Unit from 1989 to 1992 where I
26   investigated drug and narcotic-related investigations, processed asset forfeitures and investigated
27   stolen property cases.
28       While working as a supervisor in the Training Division (2005-2009), I supervised the
29   California Commission on Peace Officers Standards and Training (P.O.S.T.) Force-options
30   Simulator (FOS) and Law Enforcement Driving Simulator (LEDS) program, which was
31   implemented in 1999 in order to fulfill P.O.S.T. "perishable skills" requirements.  In this
32   program, my staff and I delivered this training to the sworn members of the San Jose Police
33   Department as well as other peace officers within Santa Clara County.  Additionally, our facility
34   was designated as a "regional skills training center" and we also provided instructor training to
35   others throughout the State of California.
36       The FOS program concentrated on teaching the state and constitutional laws regarding
37   the use of force by peace officers, as well as decision making involved in using various types of
38   force, up to and including deadly force.  The LEDS program concentrated on teaching officers
39   their legal limits, legal requirements and decision making while operating their vehicles during
40   emergency responses and pursuits.
41       My training, experience and participation specific to pursuits and law enforcement
42   vehicle operations includes the following:
43      ▸   I have engaged in or participated in pursuits while driving marked patrol cars, marked

Page 1

1      sport utility vehicles, and unmarked cars;
2    ▸ I have supervised and documented police pursuits;
3    ▸ I have conducted limited research regarding supervisory response times and the driving
4      behavior of violators after pursuits have been terminated;
5    ▸ I researched and developed an eight-hour course on "Pursuit Decision Making" and
6      delivered it in eight states;
7    ▸ My pursuit decision making course was also offered in computer-based format by "the
8      Backup, Inc.;
9    ▸ I was a featured subject-matter expert (SME) in the training video "Police Pursuit
10     Driving," published by Performance Advantage;
11    ▸ While working as the Bureau of Field Operations Training Coordinator, I reviewed and
12     evaluated pursuits for policy compliance on behalf of the deputy chief;
13    ▸ I have authored three articles pertaining to pursuit decision making and pursuit
14     termination which have been cited by other authors and researchers;
15    ▸ I am a California P.O.S.T. certified LEDS instructor;
16    ▸ I am a California P.O.S.T. certified "Emergency Vehicle Operations Course" (EVOC)
17     instructor;
18    ▸ I am a California P.O.S.T. certified "Driver Awareness" instructor;
19    ▸ I have delivered EVOC instruction to members of the San Jose Police Department;
20    ▸ I rewrote the pursuit policy of the San Jose Police Department in 2007;
21    ▸ I designed the updated pursuit policy training, trained other instructors, and delivered the
22     training to a bulk of the sworn members of the San Jose Police Department;
23    ▸ I was a member of the *California Law Enforcement Vehicle Pursuit Guidelines* revision
24     committee (in order to comply with S.B. 719);
25    ▸ I was a featured SME in the P.O.S.T. Telecourse "California Law Enforcement Vehicle
26     Pursuit;"
27    ▸ I was a member of the Vehicle Operations Training Committee, a subcommittee of the
28     California P.O.S.T. SAFE Driving Campaign; and
29    ▸ I have consulted with other supervisors and command officers regarding pursuits in
30     evaluating policy compliance.
31      I became a P.O.S.T.-certified FOS Instructor and I served as an adjunct instructor in the
32 basic FOS program provided by the South Bay Regional Public Safety Consortium from 2002 to
33 2004. In this capacity, I trained officers in Monterey and San Mateo Counties. I also served as
34 an adjunct defensive tactics instructor in the Basic Academy at the South Bay Consortium from
35 2000 to 2004.
36      From 1997 through 2004 I served as an adjunct instructor for the Field Training Seminar
37 at the South Bay Regional Consortium regarding legal and liability issues. This curriculum
38 included basic search-and-seizure law (Fourth Amendment), search warrant requirements and
39 exceptions. I taught in the same program at the San Jose Police Department until 2006. I also
40 taught legal and liability issues in the POST Supervisors Course at South Bay Regional from
41 approximately 1997 until 2004. This curriculum included investigating and documenting
42 police use of force.
43      Prior to being hired at the San Jose, Police Department, I was an officer with the San
44 Francisco Bay Area Rapid Transit (BART) District Police Department from October 1981
45 through December 1984. While there, I worked in both uniformed and plainclothes patrol
46 assignments.

1     During my law enforcement career, I have used various tactics, tools and techniques in
2 order to control subjects in field situations.  This has included uses of batons, chemical agents
3 (both CS and OC sprays), the TASER, extended-range impact munitions, various weaponless
4 measures, and motor vehicles.
5     In April of 2012, I was recruited to develop and deliver a block of instruction on "Lawful
6 Force" for the new "Officer-Involved Shooting Investigations" course produced by the California
7 POST Institute for Criminal Investigation.  I have presented this three-hour block of instruction
8 over 28 times to date.  During this block of instruction, I co-teach the legal framework required
9 for the use of force by police to meet both state statutory and federal constitutional standards.
10 This includes the legal concepts of reasonable suspicion to detain, probable cause to arrest, legal
11 authorization to use force, and objective reasonableness.
12     I was also asked to develop and deliver a three-hour block of instruction on "Human
13 Factors" in the same course.  This includes the basics of sensory and cognitive factors and how
14 they form the *perspective* of the reasonable officer.  This includes basic vision, attention,
15 perception, reaction time, officer-subject interactions, pattern (gestalt) v. detailed (feature-
16 intensive) processing, time to stop shooting responses, human memory compared to video
17 cameras, fatigue, and stress reactions.
18     I hold a Juris Doctor Degree from Northwestern California University and I am a member
19 of the State Bar of California.  I also hold a Bachelor's Degree in Psychology from California
20 State University at Hayward (now "East Bay").
21     My expertise and qualifications to provide expert testimony on the use of force by police,
22 vehicle operations, and the basics of attention, perception, memory, and the reaction time of law
23 enforcement officers, and the interactions of officers and suspects during use-of-force encounters
24 flows from the following:
25
26   1.  My education, personal experiences, and training;
27   2.  The scope of my expertise is limited to these areas as they relate to how reasonable law
28       enforcement officers are trained to conduct themselves in order to comply with the
29       constitutional limitations on their power when seizing persons, including those fleeing in
30       motor vehicles, on bicycles, and on foot; the operation of emergency vehicles with due
31       regard for the safety of others while pursuing fleeing subjects; and maintaining a safe
32       distance from pursued subjects in order to prevent sudden assaults from them.  This also
33       includes the factors affecting officers' perception and reaction time when dealing with
34       sudden changes in a pursued suspect's behavior.
35   3.  My analysis is similar to that of other experts in the field and has a factual foundation
36       based on widely accepted methods of analyzing the objective reasonableness of police
37       conduct in conducting searches and seizures of persons and vehicles;
38   4.  My understanding of the facts of this case;
39   5.  My recognition that there will be factors or evidence that may either support, not support,
40       or have a neutral effect upon my opinion; and
41   6.  The fact I have drawn conclusions based on certain assumptions and I attempted to
42       designate when I relied on disputed evidence.
43
44     My curriculum vitae is attached and incorporated into the body of this report by this
45 reference.  My professional experiences and activities are more fully set forth in my vitae, along
46 with my publications for the preceding ten years.  It also contains a list of other cases I have

Page 3

1    reviewed or in which I have testified as an expert, in deposition or in trial.

2    A considerable portion of my professional life involves the study and analysis of the
3    conduct of peace officers and law enforcement agencies and their practices, including liability
4    issues and human-performance factors. I have also rendered opinions as to police practices, as is
5    more fully set forth in my vitae.

6    I have attached my current fee schedule and incorporate it into the body of this report by
7    reference as a statement of the compensation to be paid for the study and testimony in this case.

8
9    **DATA AND OTHER INFORMATION CONSIDERED WHEN FORMING OPINION**
10
11    In forming my opinions in this case, I reviewed, studied, and considered materials that
12    are specific to this case as well as materials of general circulation. I have also drawn on the
13    totality of the materials I have read, studied, and examined, as well as the experiences and
14    instruction I have had and/or provided to law enforcement personnel over the entire course of my
15    career. The materials listed herein are the type, quality, and quantity upon which I and others in
16    my profession rely in examining the events surrounding a police practice and in forming
17    opinions and conclusions regarding the matters addressed herein.

18    All statements and opinions herein are to a reasonable, or higher, degree of professional
19    certainty and/or probability.

20    I reserve the option to modify, amend, and change any opinion expressed in this
21    document should additional information be provided affecting my understanding of the fact
22    pattern in this case. I also reserve the right to illustrate the points made in this report with
23    demonstrations and/or audio-visual aids.

24
25    The specific case materials I have reviewed to date are:

26
27    **Received via email from Adam Rushing on 5/26/15:**
28    A.  Deposition of Officer Brandon Lyon, taken 4/9/15.
29    B.  Deposition of Officer Kenneth Webb, taken 4/9/15.
30    C.  Deposition of Detective Brian Hance, taken 4/9/15.
31    D.  Deposition of Martha Galvan, taken 4/10/15.
32    E.  Deposition of Omri Orozzo, taken 4/10/15.
33    F.  Deposition of Bobby Requejo, taken 4/10/15.

34
35    **Received via email from Adam Rushing on 6/15/15:**
36    A.  Defendant's Notice of Motion and Motion for Summary Adjudication of All Federal
37          Claims, dated 6/1/15.

38
39    **Received via email from Adam Rushing on 6/16/15:**
40    A.  Complaint for Civil Rights Claim under 42 U.S.C. § 1983; Survivor Action;
41          Wrongful Death; and Negligence by Angel Keith Toscano, Jr., et al. v. City of
42          Fresno, et al. Case No. 1:13-cv-01987-LJO-SKO, filed 12/4/13.
43    B.  Complaint for Civil Rights Claim under 42 U.S.C. § 1983; Survivor Action;
44          Wrongful Death; and Negligence by Anthony Keith Toscano et al. v. City of Fresno,
45          et al. Case No. 1:14-at-00088, filed 2/11/14.

**Received via UPS from Adam Rushing on 6/16/15 on USB Drive:**

A. WAV file of Fresno PD radio traffic from 1939 until 1956 hours for case number 13-56044 .

B. WAV file of Fresno PD radio traffic from 1929 to 2000 hours (13BG1393).

C. WAV file of Fresno PD radio traffic with time announcements (13BG1393).

D. Fresno Police Department Event Report #13-BG1393 for Agency Case No. 13-056044.

E. Fresno Police Department Message Journal Report from MDS/N22.

F. Fresno Police Department Message Journal Report to N22.

G. Fresno Police Department Master Name Summary Report from RMS for Angel Keith Toscano, DOB 3/18/74.

H. California Department of Corrections documents regarding Angel Toscano, DCD #F18356, sent via fax on 1/15/14.

I. California Department of Justice Criminal History printout for Angel Keith Toscano, CII #A11754604, (DOB 3/16/74) generated on 8/26/13 by S145 – IA unit.

J. California Department of Justice Criminal History printout for Angel Keith Toscano, CII #A31704598, (DOB 6/24/95) generated on 10/3/13 by S145 – IA Unit.

K. Fresno Police Department Police Pursuit Critique forms (seven), involving Officer Brandon Lyon and Officer Kenneth Webb.

L. Fresno Police Department Training Management System report for Officer James B. Lyon, generated on 4/3/15.

M. Fresno Police Department Training Management System report for Officer Kenneth Web, generated on 4/3/15

N. California P.O.S.T. EDI report for Officer James B. Lyon generated on 4/3/15.

O. California P.O.S.T. EDI report Officer Kenneth Webb generated on 4/3/15.

P. Fresno Police Department Policy 314: Vehicle Pursuit Policy.

Q. Fresno Police Department Policy 703: Vehicle Operations & Equipment.

**Received via email from Adam Rushing on 6/30/15:**

A. Bosch *Crash Data Retrieval* report regarding VIN 2B3KA43G18H180555 generated on 8/24/13 by B. Hance.

B. Law Enforcement Report Form – Fresno Police Department Case No. 13-056044 (2/7) by Stevens (V3475) and Cassandra (P1544).

C. Law Enforcement Report Form – Fresno Police Department Case No. 13-056044 (3/7) by Barnum (V3675) and James (P1340).

D. Law Enforcement Report Form – Fresno Police Department Case No. 13-056044 (4/7) by May (V3331) and Scott (ID85). [CSI]

E. Law Enforcement Report Form – Fresno Police Department Case No. 13-056044 (5/7) by MacDonald (V3165) and Clifton (P1485). [Crime Scene Log]

F. Law Enforcement Report Form – Fresno Police Department Case No. 13-056044 (6/7) by DeSoto-Cooper (V2659) and Cynthia (ID36). [Autopsy Photos & Blood]

G. Law Enforcement Report Form – Fresno Police Department Case No. 13-056044 (7/7) by Shafer (V3217) and Matthew (ID90). [Patrol Car Photos]

H. Event Report – Fresno Police Department Case Event No. 13-BG1393 by Hummel (V3958).

1       I.  DMV Printout for James Brandon.
2       J.  Toxicology Report for Agency Case No. 13-56044; Toxicology No. CVT-13-10471.
3       K.  Equipment Work Order History for #100474 – 2008 Dodge Charger.
4       L.  Evidence Diagrams of Alley.
5       M.  DMV Printout for Angel Toscano.
6       N.  Fresno Police Department – Collision Reconstruction Unit Fatal Collision Report and
7           Supplements by  B. Hance for Case No. 13056044.
8       O.  Traffic Collision Report (CHP 555) for case number 13056044 by Hance.
9       P.  Tulare Regional Medical Center Toxicology report for Angel Toscano.
10      Q.  Accident Reconstruction Analysis Report by Eugene Vander Pol, II, dated 6/29/15.
11
12      **Court Decisions:**
13      A.  *Brower v. County of Inyo* (1989) 489 U.S. 595.
14      B.  *County of Sacramento v. Lewis* (1998) 523 U.S. 833.
15      C.  *Bryan v. McPherson* (2009) 630 F.3d 805.
16
17
18              **EXPERT OPINION:  BASIS AND REASONS THEREOF**
19
20      **Notice re my opinions:**
21          In this particular case, Detective Hance of the Fresno Police Department who
22      investigated this fatal collision has opined that Mr. Toscano was in the process of either losing
23      control of the bicycle he was riding or in the process of jumping off of it when Officer Lyon's patrol
24      car first struck the bicycle.  This cause Mr. Toscano to be propelled forward of the bicycle, after
25      which Mr. Toscano was struck by Officer Lyon's patrol car. (Hance Deposition 46:4-21;
26      Collision Investigation Report 53-55)  Also noted by Detective Hance this is supported due to
27      marks from the rear tire and brake rotor on the front bumper and push bar of the patrol car
28      indicate the bicycle was leaning to its right side at about 60 degrees when struck. (Collision
29      Investigation Report 53-55).  Detective Hance at no point identifies evidence that would suggest
30      that Officer Lyon intentionally collided with Mr. Toscano's bicycle or Mr. Toscano himself.
31      Detective Hance only identifies Officer Lyon's speed as being unsafe for the conditions, and the
32      primary collision factor (PCF) in this fatal collision.  Officer Lyon has stated, both to the first
33      officer on the scene, Officer Webb, and during his deposition, that he was pursuing Mr. Toscano
34      as he fled down the alley on the bicycle, was anticipating that Mr. Toscano would discard the
35      bicycle and flee on foot, and that he was following Mr. Toscano very from about five feet away.
36      Officer Lyon stated that he accidentally collided with Mr. Toscano and his bicycle, then
37      accelerated to get his car off of Mr. Toscano. (Lyon Deposition 28:4-8, Collision Investigation
38      Report 45-46)
39          Plaintiffs allege that Officer Lyon intentionally collided with Mr. Toscano and his
40      bicycle. (Complaints listed above)  Plaintiffs have also retained an accident reconstruction expert
41      who has opined that he believes that Mr. Toscano's bicycle was perpendicular to the ground
42      when Officer Lyon's patrol car struck it from behind. (Vander Pol report, Page 4)  I've been
43      asked by plaintiffs to assume that his constitutes evidence that Mr. Toscano was not falling or
44      dismounting his bicycle just before being struck, supporting Plaintiffs' claim that Officer Lyon
45      intentionally struck Mr. Toscano.
46          Due to the fact that a seizure by a police officer has not occurred unless the officer causes

1   the "...termination of freedom of movement through means intentionally applied [emphasis
2   omitted]" (See *Brower v. County of Inyo* (1989) 489 U.S. 595, 597). California police officers
3   are trained that seizures under the Constitution occur "...when a peace officer physically apply
4   force to a person or when a person voluntarily submits to the officer's authority."[1]

5        Police officers are also sometimes trained that accidentally and unintentionally running
6   over subjects with their patrol cars do not rise to constitutional violations.[2] (See *County of
7   Sacramento v. Lewis* (1998) 523 U.S. 833, 844)

8        Because whether or not Officer Lyon intentionally collided with Mr. Toscano as he fled
9   on his bicycle is in dispute, and that I don't have the expertise to argue with either Detective
10  Hance or Mr. Vander Pol, I'll first analyze the facts with assumption that an seizure under the
11  Fourth Amendment took place, and then I'll analyze the facts with the assumption that a seizure
12  did not occur.

13

14       **ASSUMPTION A:   Officer Lyon intentionally collided with Mr. Toscano**

15

16       **Opinion One:**

17       **Officer Lyon's attempts to detain Mr. Toscano were consistent with his training as a**
18       **California peace officer and he reasonably believed that Mr. Toscano had**
19       **committed violations of the California Vehicle Code.**

20       California peace officers are trained that it is a violation of Vehicle Code section 21650.1
21  to operate other than in the same direction as traffic.[3] Officers are also trained that the drivers of
22  *any* vehicle must top at a stop sign at an intersection.[4] Officers Lyon and Webb were driving in
23  the area of Glenn and Princeton Avenues when they saw Mr. Toscano and Mr. Bertone riding
24  their bicycles south on Glenn in the northbound lane. Although I could not find specifically
25  which stop sign for which Messrs. Toscano and Bertone failed to stop, both Officers Lyon and
26  Webb stated their probable cause to stop the two was the running of a stop sign. (Webb
27  Deposition 9:5-10; Lyon Deposition 16:4-13)

28

29       **Opinion Two:**

30       **Officer Lyon's pursuit of Mr. Toscano was consistent with his training as a**
31       **California police officer as he had probable cause to believe Mr. Toscano was**
32       **delaying and resisting Officer Lyon during the performance of Officer Lyon's duty.**

33       California peace officers are trained that they may place a person under arrest and take

---

[1] California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series -- Learning Domain 15: Laws of Arrest*, Version 4.3, p. 1-4.

[2] "Pursuit Decision Making: SJPD Class 1, PowerPoint Slides 34-37, May 2007.

[3] California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 28: Traffic Enforcement*, Version 5.5, p. 3-24.

[4] *Ibid.* at 3-8.

1   him into custody when they have sufficient "probable cause" to do so.[5]  They are further trained
2   that probable cause exists when there "is a set of facts that would cause a person of ordinary care
3   and prudence to entertain an honest and strong belief that the person to be arrested is guilty of a
4   crime."

5           Officer Lyon was driving the marked patrol car and turned on his emergency lights to
6   stop Messrs. Toscano and Bertone. (Lyon Deposition 16:19-17:1).  Mr. Bertone stopped for the
7   officers but Mr. Toscano continued riding his bicycle south on Glenn Avenue, after looking back
8   at the officers in their marked car. (Lyon Deposition 17:1-18, 18:21-19:10; Collision Report 45-
9   46)

10          Additionally, Officer Lyon told Mr. Toscano to stop as Mr. Toscano rode his bicycle
11  south along the east side of Glenn Avenue. (Lyon Deposition 18:21-19:10, 19:19-20:3)

12          California peace officers are trained that when subjects prevent them from performing
13  their duties, those subjects may be violating California Penal Code section 148(a)(1), "Resisting,
14  delaying, or obstructing any…peace officer…in the attempt or attempt to discharge any duty of
15  that officer's officer or employment."[6]  Furthermore, peace officers are specifically instructed
16  that:

17

18                  Any person who flees from a lawful detention…may be arrested
19                  for violating *Penal Code Section 148* (resisting, delaying, or
20                  obstructing any officer), provided that the action delayed or
21                  obstructed the investigation.[7]

22

23          Under these circumstances, any trained and reasonable officer would conclude that he
24  possessed sufficient probable cause to place Mr. Toscano under arrest for the crime of
25  resisting/delaying them in the performance of their duties.

26

27  **Opinion 3:**
28  **The use of the police vehicle traveling approximately 19 miles per hour to forcibly**
29  **stop Mr. Toscano was not consistent with the actions of a trained and reasonable**
30  **officer.**

31          California Peace Officers are trained in the lawful use of force in their official capacities.
32  They are specifically trained that they are authorized to "use reasonable force to effect the arrest,
33  prevent escape, or to overcome resistance" when they have "reasonable cause to believe that the
34  person to be arrested has committed a public offense."[8]

35          California Peace Officers are further trained that the "objective reasonableness" of their
36  force responses must be "fact specific" and is:

37

38      1.  Judged from the perspective of a reasonable officer.

---

[5] *Supra.* at Note 1, p. 4-4
[6] California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 39: Crimes Against the Justice System*, Version 5.0, p. 2-3.
[7] *Supra.* at Note 1, p. 3-13.
[8] California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 20: Use of Force*, Version 3.0, p. 1-3.

1      2. Examined through the eyes of an officer on the scene at the time the force was applied,
2         not the 20/20 vision of hindsight.

3      3. Based on the facts and circumstances confronting the officer without regard to the
4         officer's underlying intent or motivation.

5      4. Based on the knowledge that the officer acted properly under the established law at the
6         time.[9]

7

8        Furthermore, California peace officers are trained that a "reasonable officer" is "an
9 officer with similar training, experience, and background in a similar set of circumstances, who
10 will react in similar manner." Also, California peace officers are trained that the severity of the
11 crime, the nature and extent of the threat posed by the subject, the degree to which the subject
12 resists, and evasion by flight, are all factors that will determine whether their uses of force are
13 reasonable.[10]

14        Officer Lyon did not appear to have perceived Mr. Toscano to threaten him. (Lyon
15 Deposition 44:8-11). Although Officer Lyon noticed that Mr. Toscano had taken his right hand
16 off of the handlebars of the bicycle, causing him to suspect that Mr. Toscano was reaching for
17 contraband or a weapon (Lyon Deposition 45:1-10) the totality of the circumstances were as
18 follows:

19      1. Officer Lyon initially observed Mr. Toscano committing the two fore mentioned vehicle
20         code infractions;

21      2. Mr. Toscano's flight was on a bicycle;

22      3. The nature of Mr. Toscano's flight did not appear to pose an immediate threat to Officer
23         Toscano or the public;

24      4. Officer Lyon had no additional information that Mr. Toscano was armed or dangerous

25

26        Given the lack of threat – although Mr. Toscano's hidden right hand was a cause for
27 concern – the use of the police vehicle in order to forcibly stop the bicyclist by colliding with
28 Mr. Toscano at 19 miles per hour (Collision Investigation Report 52-53) was not an
29 "insignificant" force option. (See *Bryan v. McPherson* (2009) 630 F.3d 805, 826) Officer Lyon
30 only seemed to entertain the *possibility* that Mr. Toscano was reaching for a weapon and did not
31 articulate a belief that *it was* a weapon that Mr. Toscano was about to use. The weight of the
32 police vehicle at that speed could reasonably be expected to inflict moderate or serious injuries,
33 although it is not clear if Officer Lyon received training that would put him on notice of this
34 potential outcome in this particular context.

35        This is a situation that seems to be overlooked in law enforcement training. For example,
36 the Fresno Police Department has a vehicle pursuit policy (Policy 314) and the most prominent
37 standardized policy manual provided by Lexipol, has a foot pursuit policy (Policy 458). What
38 seems to be missing from many law enforcement agency policies and training materials, are
39 considerations for pursuing bicyclist with police vehicles.

40        It should also be noted that if an officer perceives that a fleeing suspect is concealing a
41 hand that could be reaching for or holding a weapon, it would be more prudent to create a

---

[9] *Ibid.*
[10] *Ibid.* p. 1-5.

Page 9

1   greater distance between one's patrol car and the suspect.  This is to allow the officer more time
2   to react to a suddenly appearing threat and to also make it more difficult for the suspect to
3   successfully attack the officer.
4
5       **ASSUMPTION B:    Officer Lyon unintentionally collided with Mr. Toscano**
6
7       **Opinion 1:**
8       **Officer Lyon, while lawfully pursuing Mr. Toscano, was not driving with due regard**
9       **for Mr. Toscano's safety due to the fact he was following Mr. Toscano too closely**
10      **under the circumstances.**
11          California peace officers receive specific training on the safe operation and driving of
12  their emergency vehicles.  Like any other driver on the roadway, California peace officers are
13  trained that they should maintain a safe following distance or "space cushion" between their
14  vehicles and other vehicles.  Additionally, the size of the space cushion should increase if there
15  are conditions affecting visibility or low-friction road conditions, such as gravel. This space
16  cushion is also intended to provide maneuvering room.[11]
17          Officer Lyon was approaching the west end of the alley at approximately 21 miles per
18  hour, anticipating that Mr. Toscano was about to abandon the bicycle and continue to flee on
19  foot. (Lyon Deposition 56:16-20, 71:10-16; Collision Report 52-53)  Officer Lyon noticed that
20  Mr. Toscano was starting to lose control of his bicycle, at which time his car was about five feet
21  from Mr. Toscano.  Officer Lyon let off the accelerator and was traveling at approximately 19
22  miles per hour when his vehicle struck Mr. Toscano. (Lyon Deposition 73:19-23; Collision
23  Report 52-53)  Officer Lyon slowed to eight miles per hour, and then accelerated, continuing
24  west with Mr. Toscano lodged underneath the patrol car. (Collision Report 52-53; Lyon
25  Deposition 28:4-8)
26          Officer Lyon was busy tracking Mr. Toscano, watching Mr. Toscano's movements (right
27  hand off the handlebar and out of view), and anticipating that Mr. Toscano was going to discard
28  the bicycle and flee on foot.  However, given the condition of the alley, e.g., dirt, gravel and
29  potholes, he should have maintained a much greater following distance that would have allowed
30  him to react safely react to Mr. Toscano's apparent loss of control of the bicycle.  This would
31  have also given him more time to successfully react to any sudden assault Mr. Toscano may have
32  initiated.
33
34      **Opinion 2:**
35      **Even if it was clear that Officer Lyon was using his lights and siren during the**
36      **pursuit of Mr. Toscano, his unsafe following distance indicated that he was not**
37      **driving with due regard for Mr. Toscano's safety.**
38          In his collision investigation report, Detective Hance noted that, because Officer Lyon
39  was not using his emergency lights or siren during the pursuit, that Officer Lyon violated the
40  basic speed law, § 22350 V.C.  While peace officers are exempt from rules of the road when
41  using their lights and siren pursuant to § 21055 V.C., § 21056 V.C. does not relieve them of the
42  duty to drive with due regard for the safety of all persons using the highway.

---

[11] California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 19: Vehicle Operations*, Version 4.2, p. 1-3, 1-12, 1-16.

1    By following Mr. Toscano so closely at the speeds identified by the GPS-AVL system, he
2  was unable to react in time to avoid striking Mr. Toscano.

3

4    **Opinion 3:**
5    **Officer Lyon was in compliance with the P.O.S.T regulations regarding vehicle**
6    **operation training.**
7    California P.O.S.T. Regulation 1005(d)(4) provides the requirements for "perishable
8  skills" training for peace officers.  This requires that officers receive 12 hours of perishable skills
9  training in each two-year period.  A minimum of four hours out of the 12 hours must include
10  driver training, driver awareness, or driving simulator instruction.
11    Section D of the regulation specifies that one or more instructional methodologies be
12  used, which includes behind the wheel (actual driving), driving simulator or classroom
13  interactivity (interactive discussion, written exercises, or video instruction).
14    The Fresno Police Department appears to have provided significantly more training than
15  the minimum training required.  For example, Officer Lyon had attended the following training
16  before this incident:

17

18    7/26/2006:    LEDS/FOS
19    6/30/2007:    Pursuit Driving Update telecourse (California Law Enforcement Vehicle Pursuit)
20    10/31/2007:   Driver Awareness Update
21    8/8/2008:     Driver Training/EVOC Update & PIT (behind the wheel)
22    4/3/2009:     Driver Awareness Update
23    10/29/2010:   EVOC (behind the wheel)
24    8/25/2011:    LEDS/FOS
25    7/26/2013:    Driving (Perishable Skills Program)

26

27

28

29

30

31

32  Respectfully Submitted,

33

34  JEFFREY A. MARTIN

35  _____

36

37

38  Date: _____
39  San Carlos, California